IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | CIVIL CASE NO. |
| | § | |
| v. | § | _____ |
| | § | |
| RIVERSIDE PARTNERS, LLC d/b/a | § | |
| THE RIVERSIDE COMPANY, | § | **JURY TRIAL DEMANDED** |
| CASTLEWOOD TREATMENT CENTER, | § | |
| LLC d/b/a ALSANA TREATMENT | § | |
| CENTER, BRITTNEY GIBBS, | § | |
| and JOHN DOES 1 - 10, | § | |
| | § | |
| Defendants. | § | |

## **PLAINTIFF'S ORIGINAL COMPLAINT**

Jane Doe, ("Plaintiff"), hereby sues the Defendants, Riverside Partners, LLC d/b/a

The Riverside Company ("Riverside"), Castlewood Treatment Center, LLC d/b/a Alsana

Treatment Center ("Castlewood"), Brittney Gibbs ("Gibbs"), and John Does 1 – 10 ("John

Doe Defendants") and alleges as follows:

### **Introduction**

*"I reflected and realized I hurt others on purpose because it makes me feel good." …
"There's a darkness in me …"*

*"I participated in the toxic behaviors I didn't know any better, and sometimes I knew
better but did not care." "But, some days I hate myself, and I cause hell in other
people's lives."*

*Defendant, Brittney Gibbs, therapist employed by Riverside and Castlewood*

1.      This is an action for substantial and irreparable physical, emotional, and

psychological harm that Defendant Gibbs – and her employer, Defendants Riverside and

Castlewood - perpetrated on Plaintiff Jane Doe[1], during the course of what was to have been life-saving treatment for an eating disorder. It is predicated on theories of negligent hiring, supervision, and retention, negligent and intentional infliction of emotional distress, professional and common law negligence, civil conspiracy, fraud by non-disclosure, violation of the Corporate Practice of Medicine Doctrine, and principles of respondeat superior.

## PARTIES, JURISDICTION, AND VENUE

2.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, as it is a civil action wholly between citizens of different states and the amount in controversy is in excess of the Court's jurisdictional minimum for diversity cases.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because Castlewood was incorporated in the State of Missouri and conducts business in this district. In addition, a substantial part of the events giving rise to Plaintiff's claims occurred in St. Louis County, Missouri.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claim for relief arose in St. Louis County.

5.      Plaintiff is and, at all times material to this Complaint, was a resident of the State of Arizona.

6.      Defendant Riverside is and, at all times material to this Complaint, was a global private equity company organized and existing under the laws of the State of Delaware.

---

[1] Because mental illness and substance use disorders remain subject to pervasive stigma, Plaintiff has legitimate concerns about publicly disclosing her identity. For that reason, Plaintiff has chosen to file this action pseudonymously, using the fictitious name "Jane Doe." The identity of Plaintiff will be fully disclosed to Defendants and to the Court, so long as such identifying information is not released into the public record. Plaintiff's motion to proceed under a pseudonym will be filed as soon as practicable after Defendants' counsel has entered an appearance.

Riverside conducts significant business in the State of Missouri but does not maintain a registered agent in the state. As such, pursuant to Mo. Rev. Stat. § 347.033, service of process may be had upon Riverside through the Missouri Secretary of State, P.O. Box 778, Jefferson City, Missouri 65102. The Missouri Secretary of State may then forward process to Riverside at its principal place of business, 45 Rockefeller Center, 630 Fifth Avenue, Suite 400, New York, New York 10111.

7.     Defendant Castlewood is and, at all times material to this Complaint, was a corporation organized and existing under the laws of the State of Missouri with its principal place of business in Ventura County, California. Castlewood purports to be engaged in the for-profit business of providing treatment to individuals who suffer from eating disorders and their many co-occurring illnesses. Castlewood may be served with a copy of this Complaint by and through its registered agent, *to wit*: CT Corporation, 120 South Central Avenue, Suite 400, St. Louis, Missouri 63105.

8.     Defendant Gibbs is and at all times material to this Complaint, was a resident of the State of Missouri. She may be served with process at her home address of:  229 Presswick Lane, St. Louis, Missouri 63303.

9.     Upon information and belief, Defendants John Does 1 – 10 are and, at all times material to this action, were individuals and corporate entities with actual knowledge of, and who participated in the acts and/or omissions of Riverside and Castlewood. These John Doe Defendants could include: current and former Chief Executive Officers, Managers and Members, owners, shareholders and all control persons employed by Riverside and Castlewood from January 2017 to present. After conducting necessary

discovery, Plaintiff anticipates being able to identify the specific John Doe Defendants as well as the acts in which they engaged in furtherance of their wrongful conduct.[2]

## **GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

10.     Plaintiff is a loving partner. She also suffers and for some period of time prior to her admission to Castlewood had suffered from one or more types of eating disorders as defined by the Diagnostic and Statistical Manual Fifth Edition ("DSM-V") and various co-occurring conditions.[3]

11.     As part of her efforts to recover from this deadly mental illness, Plaintiff was induced to seek treatment at Castlewood. However, up until the day she was admitted into the St. Louis treatment facility, Plaintiff believed she was being admitted into one of Castlewood's California facilities.

12.     Upon her arrival at Castlewood on June 15, 2021, Plaintiff was told to just "hang out for a while and that someone would be with her soon." She ultimately was told that no one was scheduled to admit at the Honeybee House that day. She was then taken to the Hawthorn House just up the road to see if she was supposed to be there.

13.     The administrators at the Hawthorn House, in turn, told Plaintiff to place her belongings in an office. She was never given a tour or oriented to her surroundings even though she asked several times to be shown around. Her belongings were then searched without her being present.

---

[2] All conditions precedent to the filing of this action have occurred, been performed, and/or been waived.
[3] Eating disorders are life-threatening illnesses that afflict an estimated 29 million Americans and are the third most common chronic illness among adolescents.

14.     Despite the fact that Plaintiff arrived right after lunch time after flying from her out of state home, she was not offered food and did not meet with her treatment team to assess her then current condition.

15.     From the beginning, the lack of communication between Plaintiff and Castlewood personnel was alarming. When Plaintiff needed anything medically, the nurses said they would "ask the doctor" and get back to her. But, on numerous occasions, that did not happen, despite Plaintiff's repeated requests.

16.     Plaintiff had not been able to move her bowels for 2 weeks. Castlewood finally sent Plaintiff to an urgent care facility. The medical providers at that facility recommended an enema and stimulant laxative. Castlewood ignored their recommendations and, instead, kept Plaintiff on Miralax.

17.     On at least 4 separate occasions, Plaintiff was either given someone else's medications or the wrong medications at the wrong time. Further, for the first 2 ½ weeks, Castlewood did not administer medication that Plaintiff's doctors had prescribed to treat a pituitary condition.

18.     During that same first 2½ week period, group sessions were regularly cancelled, turned into "free art," with no actual therapy happening, or cut very short. Many times, Castlewood employees would gather the patients in a room to take names and then let them go without providing any therapy.

19.     When group therapy sessions actually were conducted, on many, if not most occasions, they were not organized, the group leaders were not prepared, and patients were allowed to do whatever they wanted

20.     Plaintiff grew increasingly despaired as she came to believe that her needs did not matter. Simple things like forgetting to get Plaintiff for lunch or not having made meals

for Plaintiff on several occasions made Plaintiff feel even more invalidated and like she did not deserve care.

21.     Oversight and control over patients in the Castlewood program were so lax that Plaintiff was allowed to leave the campus to pick up her medicines from pharmacies.

22.     Little did Plaintiff realize at the time what devastating damage Castlewood was about to unleash on her in the person of Defendant Gibbs.

23.     Riverside/Castlewood employed Gibbs to serve as a therapist in or about May 2021. However, to date, a search of the Missouri Division of Professional Registration indicates that Gibbs does not have a license as Social Worker, Professional Counselor, Occupational Therapist or any other profession. And yet, Riverside/Castlewood allowed Gibbs to have access to, and provide individual counseling to patients, including Plaintiff.

24.     Upon information and belief, Riverside/Castlewood did so without performing any substantive background check on Gibbs. Had they simply done a search of Gibbs' publicly accessible social media postings, they would have discovered a series of blog articles written by Gibbs on her then Twitter feed[4].

25.     The content of those articles is deeply disturbing, especially in light of the fact that Riverside/Castlewood would subsequently place Gibbs, with little or no supervision, in a vital and authoritative position of trust with the most vulnerable of all populations of patients. Gibbs' articles included the following statements:

"Fuck love. Love hurts. Get a hobby."

---

[4] Notwithstanding the fact that the undersigned notified Castlewood of the above-referenced statements, his representation of Plaintiff and intention to file suit, and his demand that Castlewood and Gibbs take steps to preserve all evidence that could potentially be pertinent to Plaintiff's claims, Gibbs' Tik-Tok and Twitter accounts subsequently disappeared.

"I reflected and realized I hurt others on purpose because it makes me feel good." … "There's a darkness in me …"

"I can be toxic to the people I love."

"I participated in the toxic behaviors I didn't know any better, and sometimes I knew better but did not care."

"But, some days I hate myself, and I cause hell in other people's lives."

"One day I won't say things to people strictly to hurt them."

"I became strong built from rage, and hate."

"My mother hates me." "The relationship with my mom now … Well she lives four houses down, and cant [sic.] look at me passing by.

"I have one sibling out of 4 that [sic.] communicate [sic.] with me. Yes, that's her manipulation."

"My mom looks at me with such hatred I start to look at myself with the same view."

"I didn't receive a call from my mother apologizing, or asking how I'm doing. She strictly cut me from her life as if I was the umbilical cord."

"That my lady is savage, and I commend you because you won this game of cruelty mom."

26.     The American Psychiatric Association defines "*antisocial personality disorder*" as, "the presence of a chronic and pervasive disposition to disregard and violate the rights of others. Manifestations include repeated violations of the law, exploitation of others, deceitfulness, impulsivity, aggressiveness, reckless disregard for the safety of self and others, and irresponsibility, accompanied by lack of guilt, remorse, and empathy. The disorder has been known by various names, including dissocial personality, psychopathic

personality, and sociopathic personality. It is among the most heavily researched of the personality disorders and the most difficult to treat. It is included in both *DSM−IV−TR* and *DSM−5*."

27.    The public generally refers to a person who demonstrates these qualities as a "sociopath." Riverside/Castlewood refer to them as "employee" and "therapist".

28.    For reasons unknown to Plaintiff, Riverside/Castlewood allowed Gibbs to lead individual therapy with Plaintiff at a time before Gibbs had received her professional license and before she completed her alleged training.

29.    During these so-called therapy sessions, Gibbs admitted to Plaintiff and other persons that she wasn't familiar with basic modalities that Alsana represents its therapists use. She further admitted that she hadn't had any eating disorder training, that she had just started working at Alsana, and that she wasn't licensed.

30.    The "therapy" Gibbs provided Plaintiff included showing her videos Gibbs had seen on TikTok. Gibbs even showed Plaintiff her personal TikTok posts. Gibbs advised Plaintiff that no one would know if she (Plaintiff) "followed" Gibbs, but that she (Gibbs) wouldn't "follow" Plaintiff back while she was still a patient in case someone was able to see that and get her in trouble.

31.    Gibbs further stated that she thought Alsana's program was "horrible" and that she was only planning to be there to get the hours needed for her license and try to make some changes to the program and then she would leave.

32.    Gibbs talked negatively about other clinicians at Alsana and disclosed details about their personal lives and why Gibbs believed they act the way they do, and that Plaintiff and others shouldn't trust them.

33.     Gibbs further stated that she reads books and does research to try to find ways to have power over people, how she had figured everyone else out who works at Alsana and how she can manipulate them into doing what she wants. She even went so far as to say she wouldn't send her own daughter to Alsana if she needed help.

34.     Gibbs also stated that she just wished she could be friends with Plaintiff outside of therapy. Gibbs stated that she doesn't follow all of the rules and she still talks to some of the kids that she worked with from her previous job. Gibbs told Plaintiff and others to lie and say that Plaintiff could get her phone at night for spiritual reasons because if Plaintiff said that then she would be allowed to have it when other patients weren't. Gibbs confirmed that she could find ways around anything.

35.     Almost immediately, Gibbs' sociopathic denigration of a close, family structure manifested itself in her manipulation of Plaintiff. Gibbs started to paint Plaintiff's partner in a negative light. Gibbs told Plaintiff that her partner didn't have Plaintiff's best interests at heart and that Plaintiff's partner was only looking out for herself. Gibbs' negative remarks escalated into her telling Plaintiff that her partner was narcissistic, and that Plaintiff should not even speak with her, let alone be with her.

36.     Gibbs conducted only one "family session" with Plaintiff and her partner.  Gibbs raised her voice throughout the session, while summarily dismissing all opinions, views and fears expressed by Plaintiff's partner. The "family session" ended and, immediately thereafter, Gibbs slammed her computer shut and loudly stated, "I don't know how you've put up with that bitch for 11 years!"

37.     Gibbs ultimately convinced Plaintiff to revoke the Release of Information authorization previously given to Plaintiff's partner. This was done immediately after Plaintiff's partner had emailed the Director of Clinical Services and informed her of

concerns she had regarding Gibbs and Castlewood in general. Gibbs also convinced Plaintiff to immediately speak with leadership at Castlewood and to advise them that everything Plaintiff's partner had emailed to Samantha Wideman, Castlewood's Director of Clinical Services was a lie.

38.     Gibbs instructed Plaintiff to say that she had no concerns about Gibbs and wanted her to continue being her therapist. Gibbs advised Plaintiff that she should take a break from communicating with her partner.

39.     Gibbs' continued manipulation included warning Plaintiff that if she told anyone certain things that Gibbs would get in trouble, Plaintiff would lose Gibbs as a therapist, virtually guaranteeing that Plaintiff wouldn't do well, since "was the only one who was helping Plaintiff and Plaintiff couldn't get better without her."

40.     Gibbs ramped up her unethical manipulation the very day Plaintiff left Castlewood. Before Plaintiff even left the Castlewood property, Gibbs followed Plaintiff on TikTok. Plaintiff and Gibbs then started communicating and Gibbs asked Plaintiff if Plaintiff wanted Gibbs to pick her up and they could dine together.

41.     When Gibbs picked up Plaintiff, she gave her a hug and a necklace with a crystal on it. Gibbs stated that the crystal would protect her from other people's negative energy.

42.     Gibbs took Plaintiff to a restaurant and bar called Molly's in the Soulard area of St. Louis. Under Gibbs "watchful" eye, Plaintiff became impaired on alcohol.  Gibbs then took Plaintiff to her hotel and stated she could pick up Plaintiff the next day if Plaintiff changed her flight to Arizona the following morning.

43.     Plaintiff rescheduled her flight and stayed in St. Louis. The following day, Gibbs picked up Plaintiff, took her to a liquor store and then took Plaintiff to her house.  Gibbs

then cooked dinner. Gibbs' daughter, Paityn was in the apartment, but she stayed in her room most of the time.

44.   Plaintiff and Gibbs watched a movie that was only on HBO. Gibbs stated that her account wasn't working, so she asked another former patient of Castlewood with whom she was in close contact if they could use her HBO Max account.  Later that same night, Gibbs drove Plaintiff back to her hotel so that she could attempt to make her early morning flight.

45.   Plaintiff was frightened to return home to Arizona because Gibbs had repeatedly told Plaintiff that Gibbs believed the only way Plaintiff would get better and continue to do well is if Plaintiff was single. That meant at the very time Plaintiff was fighting for her life, she would have to tell her partner that she did not want to be with her anymore. Plaintiff was so mentally checked out and emotionally numb, that she believed Gibbs was the only one who knew what Plaintiff needed.

46.   Consequently, when Plaintiff returned home, she told her partner that she wasn't sure she wanted to be with her anymore and that she thought she wasn't in love with her anymore.

47.   Gibbs continued to manipulate Plaintiff. She maintained daily contact with Plaintiff after Plaintiff left Castlewood with those communications sometimes lasting for multiple hours each day. Gibbs also violated HIPAA by sharing detailed information about other patients of Castlewood during these communications. She stated that she did not care if she got in trouble for talking to her because Plaintiff was one of her "soul best friends" now. However, even then, Gibbs stated that Plaintiff shouldn't tell anyone though because she could lose her job.

48.     Gibbs' reprehensible conduct was not just foreseeable but inevitable since Riverside and Castlewood operates its facilities in a manner that is designed to maximize profits at the expense of providing quality mental health treatment and ensuring the safety of those entrusted to their care.

49.     Indeed, Gibbs is simply one of the latest chapters in what has been the sordid and harm-inducing history of Castlewood. This history that has included, but is not limited to:

- A series of lawsuits brought by Lisa Nasseff and others against Castlewood and its founder, Schwartz accusing Schwartz of implanting false memories of sexual abuse, satanic cult activity, brainwashing and hypnosis that ultimately led to the resignations of Schwartz and Galperin.

- Accusations of Castlewood having violated the Americans with Disabilities Act brought by a woman who had a serious eating disorder, who allegedly was promised, but ultimately denied admission because she was HIV+ - claims that were successfully prosecuted by the United States Justice Department.

- The Missouri Committee of Psychologists 2017 censure of Schwartz after a patient complained in 2013 about a lack of supervision at Castlewood, the investigation into which revealed that while Schwartz and Galperin were directors at the Masters and Johnson Trauma units at Two Rivers Psychiatric Hospital in Kansas City and also at River Oaks Hospital in New Orleans, lawsuits were filed against these hospitals for implanting memories of multiple personality and satanic ritual abuse;

- Castlewood's hiring in April 2013 of Nicole Siegfried, who, for at least the nine (9) months prior to her being hired, had been investigated by the Alabama Board of Examiners in Psychology and placed on probation and practice supervision for one year for ... "failure to document professional work and maintain records and engaging in a multiple relationship, patient harm and exploitive relationship;"

- Accusations by a current Castlewood employee in July 2021, that: "Leadership is very inexperienced. Due to high turnorver [sic.] and dificulty [sic.] with finding qualified applicants in the surrounding area, there have been quite a few internal transitions that are not effective. Newly licensed individuals can/have become part of leadership or promoted within leadership without leadership experience! Those with lesser experience do not feel confident in receiving feedback from those who, frankly. barely know what they are doing themselves. There is a push toward only one or two modalities of treatment (IFS and attachment theory), with little insight or training to other effective modalities. There is also very little understanding of the impact of comorbid or co-occuring diagnosis on eating disorders, thereby lessining [sic.] the effectiveness of the treatment;

- Blatant misrepresentations regarding its treatment protocol and the efficacy of the treatment afforded, specifically that its treatment regimens are "evidenced based", when, in truth, they are anything but;

- In January 2021, being sued for violating HIPAA laws;

- Creating and fostering a racially hostile environment in which African-American patients are denigrated

50.     Plaintiff eventually terminated her communications and relationship with Gibbs. She then contacted Plaintiff's counsel. On November 23, 2021, Plaintiff's counsel contacted attorneys then representing Castlewood in another complaint being brought by a former patient of Castlewood who was also represented by Plaintiff's counsel.

51.     Castlewood's then counsel represented that the correspondence had been sent to her client.  After that correspondence was received by Castlewood, Gibbs deleted her TikTok Account. And despite a demand that Gibbs cease all communications with Plaintiff's counsel's clients, the very next day, Gibbs attempted on two occasions to contact one of Plaintiff's counsel's clients. A second letter was then sent to Castlewood through counsel informing Castlewood that their employee was continuing with her behavior.

52.     On Friday, December 17, 2021, Plaintiff's counsel discovered that despite having actual knowledge of Gibbs' predatory nature, Castlewood stood behind and supported Gibbs by retaining her as an employee. A predator employee conducting group sessions. A predator employee conducting individual sessions. A predator employee with access to persons suffering from the mental illness with the second highest mortality rate among all mental illnesses.

53.     Plaintiff's claims against Gibbs resulted in an avalanche of additional issues and reprehensible conduct perpetrated by other Castlewood employees coming to light. On January 26, 2022, Gayle Devin, the current CEO of Castlewood issued a press release admitting that Castlewood "recently learned that ... direct care employees might have been involved in inappropriate conduct involving a client receiving outpatient care at our St. Louis program. Based on our initial review, the allegations involve significant violations of company policy, and we have taken immediate action, including terminating

employees and removing employees who remain under investigation from any client setting."

54.    Upon information and belief, four (4) additional employees besides Gibbs are involved with allegations of illegal drug use, alcohol use, sexual activity and other fraternization.

### Causes of Action as to Castlewood and Gibbs

### Count One

### Intentional Infliction of Emotional Distress

55.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

56.    Castlewood had a fiduciary duty to Plaintiff to exercise the highest degree of care for the safety of Plaintiff and the other patients entrusted to its care. Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and the highest place of trust.  Despite having this knowledge, Castlewood, individually and through its agents, servants and employees, including but not limited to Gibbs, breached its fiduciary duties and intentionally inflicted emotional distress upon Plaintiff.

57.    In Missouri, in order to state a claim for intentional infliction of emotional distress, a plaintiff must plead:

      1) the defendants' conduct was extreme and outrageous;

      2) the conduct was intentional or done recklessly, and;

      3) the conduct caused severe emotional distress resulting in bodily harm.

58.    Gibbs' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, was atrocious, and utterly intolerable in a civilized

community.  Gibbs intentionally interfered in Plaintiff's relationship with her partner; told Plaintiff that her partner didn't have Plaintiff's best interests at heart and that Plaintiff's partner was only looking out for herself. Gibbs' negative remarks escalated into her telling Plaintiff that her partner was narcissistic, and that Plaintiff should not even speak with her, let alone be with her. Gibbs conducted only one "family session," and in that session, Gibbs raised her voice throughout the session while dismissing all opinions, views and fears expressed by Plaintiff's partner. The "family session" ended and immediately thereafter, Gibbs slammed shut her computer and stated, "I don't know how you've put up with that bitch for 11 years!"

59.    Gibbs convinced Plaintiff to revoke the Release of Information authorization previously given to Plaintiff's partner. Gibbs also convinced Plaintiff to immediately speak with leadership at Castlewood and to advise that everything Plaintiff's partner had emailed to Samantha Wideman, Castlewood's Director of Clinical Services was a lie. Plaintiff was instructed to say that she had no concerns about Gibbs and wanted her to continue being her therapist. Gibbs advised Plaintiff that she should take a break from communicating with her partner.  Gibbs' continued manipulation included warning Plaintiff that if she told anyone certain things that Gibbs would get in trouble, Plaintiff would lose her as Plaintiff's therapist and as a result, Plaintiff certainly wouldn't do well then, as Gibbs made it clear that she was the only one that was helping Plaintiff and Plaintiff couldn't get better without her.

60.    Castlewood, and its employees such as Gibbs, knew that Plaintiff was particularly susceptible to emotional distress. As such, Castlewood, individually and through its employees, including but not limited to, Gibbs, knew or should have known that their conduct involved an unreasonable risk of causing the injuries and damages sustained by

Plaintiff. Further, on or about June 30, 2021, Plaintiff's partner contacted Castlewood and advised them of her concerns about Gibbs and Castlewood's program. Upon information and belief, Castlewood chose not to investigate these concerns. Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

61.     As a proximate result of the foregoing intentional wrongful acts of Castlewood and Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the jurisdictional limits of this Court for which Plaintiff herein sues.

62.     Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justifies an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### Count Two

### Negligent Infliction of Emotional Distress

63.     Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

64.     Castlewood had a fiduciary duty to Plaintiff to exercise the highest degree of care for the safety of Plaintiff and the other patients entrusted to its care. Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and

confidence and owed to Plaintiff a fiduciary duty and the highest place of trust. Despite having this knowledge, Castlewood, individually and through its agents, servants and employees, including but not limited to Gibbs, breached its fiduciary duties and negligently inflicted emotional distress upon Plaintiff.

65.     In Missouri, a claim for negligent infliction of emotional distress mirror claims for negligence. As such, a plaintiff must plead:

> 1) a legal duty of the defendant to protect the plaintiff from injury;
>
> 2) breach of the duty;
>
> 3) proximate cause, and;
>
> 4) injury to the plaintiff.

66.     As an eating disorder treatment center, Castlewood had the duty to protect Plaintiff from injury. Castlewood, individually and through Gibbs breached that duty by:

A.      hiring a person with anti-social personality disorder to act in the role of a trusted counselor;

B.      failing to investigate Gibbs before employing her in the role of a trusted counselor;

C.      failing to adequately train Gibbs;

D.      failing to properly supervise Gibbs;

E.      failing to provide a safe environment where Plaintiff would be free from abuse and the actions of predators;

F.      failing to protect Plaintiff from harmful predators like Gibbs;

G.      intentionally interfering in Plaintiff's relationship with her partner;

H.      telling Plaintiff that her partner didn't have Plaintiff's best interests at heart;

I.      telling Plaintiff that she should cut off all communications with her partner and terminate the relationship with her;

J.      conducting one family sessions in which Gibbs dismissed all opinions, views and fears expressed by Plaintiff's partner;

K.      telling Plaintiff that, "I don't know how you've put up with that bitch for 11 years!"

L.      convincing Plaintiff to revoke the Release of Information authorization previously given to Plaintiff's partner;

M.      convincing Plaintiff to immediately speak with leadership at Castlewood and to advise that everything Plaintiff's partner had emailed to Samantha Wideman, Castlewood's Director of Clinical Services was a lie;

N.      instructing Plaintiff to say that she had no concerns about Gibbs and wanted her to continue being her therapist.

O.      warning Plaintiff that if she told anyone certain things that Gibbs would get in trouble, Plaintiff would lose her as Plaintiff's therapist and as a result, Plaintiff certainly wouldn't do well then.

67.     Plaintiff incorporates paragraphs 10 - 54 herein as if set forth verbatim because said paragraphs contain additional facts supporting Plaintiff's negligent infliction of emotional distress claims.

68.     Castlewood, and its employees such as Gibbs, knew that Plaintiff was particularly susceptible to emotional distress. As such, Castlewood, individually and through its employees, including but not limited to, Gibbs, knew or should have known that their conduct involved an unreasonable risk of causing the injuries and damages sustained by

Plaintiff. In addition, Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

69.    As a proximate result of the foregoing intentional wrongful acts of Castlewood and Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the jurisdictional limits of this Court for which Plaintiff herein sues.

70.    Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justifies an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Three

## Negligence

71.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

72.    Castlewood had a fiduciary duty to Plaintiff to exercise the highest degree of care for the safety of Plaintiff and the other patients entrusted to its care. Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and the highest place of trust.  Despite having this knowledge, Castlewood, individually and through its agents, servants and

employees, including but not limited to Gibbs, breached its fiduciary duties and committed negligent conduct directed toward Plaintiff.

73.     In Missouri, in a claim for negligence, a plaintiff must plead:

      1) a legal duty of the defendant to protect the plaintiff from injury;

      2) breach of the duty;

      3) proximate cause, and;

      4) injury to the plaintiff.

74.     As an eating disorder treatment center, Castlewood had the duty to protect Plaintiff from injury. Castlewood through Gibbs breached that duty by:

      A.     hiring a person with anti-social personality disorder to act in the role of a trusted counselor;

      B.     failing to investigate Gibbs before employing her in the role of a trusted counselor;

      C.     failing to adequately train Gibbs;

      D.     failing to properly supervise Gibbs;

      E.     failing to provide a safe environment where Plaintiff would be free from abuse and the actions of predators;

      F.     failing to protect Plaintiff from harmful predators like Gibbs;

      G.     intentionally interfering in Plaintiff's relationship with her partner;

      H.     telling Plaintiff that her partner didn't have Plaintiff's best interests at heart;

      I.     telling Plaintiff that she should cut off all communications with Plaintiff and terminate her relationship with her;

      J.     conducting one family sessions in which Gibbs dismissed all opinions, views and fears expressed by Plaintiff's partner;

K.      telling Plaintiff that, "I don't know how you've put up with that bitch for 11 years!"

L.      convincing Plaintiff to revoke the Release of Information authorization previously given to Plaintiff's partner;

M.      convincing Plaintiff to immediately speak with leadership at Castlewood and to advise that everything Plaintiff's partner had emailed to Samantha Wideman, Castlewood's Director of Clinical Services was a lie;

N.       instructing Plaintiff to say that she had no concerns about Gibbs and wanted her to continue being her therapist.

O.      warning Plaintiff that if she told anyone certain things that Gibbs would get in trouble, Plaintiff would lose her as Plaintiff's therapist and as a result, Plaintiff certainly wouldn't do well then.

75.     Plaintiff incorporates paragraphs 10 - 54 herein as if set forth verbatim because said paragraphs contain additional facts supporting Plaintiff's negligence claim.

76.     Castlewood, and its employees such as Gibbs, knew that Plaintiff was particularly susceptible to emotional distress. As such, Castlewood, individually and through its employees, including but not limited to, Gibbs, knew or should have known that their conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. In addition, Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

77.     As a proximate result of the foregoing wrongful acts of Castlewood and Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as

described hereinabove. Plaintiff's damages exceed the jurisdictional limits of this Court for which Plaintiff herein sues.

78.     Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justify an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Five

## Recklessness

79.     Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

80.     Plaintiff brings this claim against Castlewood and Gibbs under a recklessness cause of action. Recklessness is a separate cause of action from negligence and does not require a finding of negligent conduct. Under a recklessness theory, a plaintiff need only prove that Defendant's conduct is in reckless disregard of the safety of another; if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result.

81.     Castlewood had a fiduciary duty to Plaintiff to exercise the highest degree of care for the safety of Plaintiff and the other patients entrusted to its care. Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and the highest place of trust.  Despite

having this knowledge, Castlewood, individually and through its agents, servants and employees, including but not limited to Gibbs, breached its fiduciary duties and were reckless in their conduct, actions and misrepresentations.

82.   Defendants' conduct set forth above and in paragraphs 25 and 28 - 47 was willful, wanton and contains a risk of harm to the patients at Castlewood, including but not limited to Plaintiff.

83.   Castlewood, and its employees including but not limited to Gibbs, knew that Plaintiff was particularly susceptible to emotional distress. As such, Castlewood, individually and through its employees, including but not limited to, Gibbs, knew or should have known that their conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. In addition, Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

84.   As a proximate result of the foregoing wrongful acts of Castlewood and Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the jurisdictional limits of this Court for which Plaintiff herein sues.

85.   Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justify an award of punitive

damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Causes of Action as to Castlewood

## Count One

## Negligent Hiring

86.     Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54 as if fully set forth herein.

87.     Castlewood was negligent in hiring Gibbs.

88.     Under Missouri law, a plaintiff states a prima facie case of negligent hiring by pleading:

(1) the employer knew or should have known of the employee's dangerous proclivities, and;

(2) the employer's negligence was the proximate cause of the plaintiff's injuries.

89.     In addition, a plaintiff must allege that the employee demonstrated dangerous proclivities before committing the act that caused the injury at issue.

90.     Prior to offering employment to Gibbs, Castlewood had the express duty to conduct due diligence into Gibbs' background and personal history. Had Castlewood conducted even the most rudimentary due diligence, such as searching Gibbs' social media posts, Castlewood would have discovered that:

A.      Gibbs lost custody of her own biological child because of Gibbs' emotional and mental instability;

B.      Gibbs published articles expressing her hatred for her mother;

C.      Gibbs published articles stating that she liked to sometimes hurt people because it made her feel good;

D.   Gibbs published articles indicating that she participated in toxic behaviors because she didn't know any better, and sometimes she knew better but did not care;

E.   Gibbs published articles indicating that, "... some days I hate myself, and I cause hell in other people's lives."

F.   Gibbs published articles indicating that she did not believe in love, that people should get a hobby instead.

91.   As such, Castlewood knew, or should have known of Gibbs' dangerous proclivities. However, upon information and belief, Castlewood chose to conduct no effective due diligence. To obtain the information set forth in the prior paragraph, Castlewood only needed to conduct a google search utilizing the term, "Brittney Gibbs social media."  This search would have disclosed Gibbs' Twitter account which contained all of the offending and offensive articles. Instead, Castlewood decided to employ a predator and let loose this predator on her victims, including but not limited to Plaintiff.

92.   As a proximate result of the foregoing wrongful acts of Castlewood, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are in excess of the jurisdictional limits of this Court for which Plaintiff herein sues.

93.   Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendant's conduct justifies an award of punitive damages against Defendant in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Two

## Negligent Training

94.   Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

95.   Castlewood was negligent in its training, if any, of Gibbs.

96.   Castlewood owed the general public, particularly the patients who are admitted to Castlewood and their families, including but not limited to, Plaintiff, the highest duty to properly train its employees in all aspects of providing the most effective, evidence-based treatments of eating disorders and its many co-occurring illnesses. Since eating disorders are one of the more complex mental illnesses, therapists must have a thorough understanding, and working knowledge of the biological and psychological aspects of this illness.

97.   Castlewood failed to train its employees, including but not limited to Gibbs in that:

(1).   Castlewood did not conduct training sessions on the various, evidence-based treatments of eating disorders, which such training has been vetted, approved and implemented by reputable eating disorder professionals, organizations or agencies;

(2).   Castlewood, at most, trains its employees only on its own treatment protocols, protocols which have not been researched, studied, approved or adopted by any reputable, third party;

(3).   Castlewood does not utilize nor require its employees to engage in role playing methods of assessment during whatever alleged training it purportedly gives to its employees;

(4).     Castlewood does not adhere to any generally acceptable or recommended standards of training set forth by the American Psychiatric Association or American Psychology Association;

(5).     Castlewood does not educate its therapists on safe boundaries with patients or the manner in which to best serve their patients' complex needs.

98.     Castlewood does not train its counselors, therapists, direct care personnel, nurses, medical personnel or mental health personnel in generally accepted treatment guidelines and standards utilized by eating disorder professionals.

99.     Because Castlewood does not adequately train its employees, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are within the jurisdictional limits of this Court for which Plaintiff herein sues.

100.    Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justify an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Three

## Negligent Supervision

101.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54 as if fully set forth herein.

102.    Castlewood was negligent in supervising, if any, of Gibbs.

103.    Missouri law holds that negligent supervision is a variant of the common law tort of negligence. A plaintiff bringing a negligent supervision claim must show:

(1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm;

(2) a breach of that duty;

(3) proximate cause between the breach and the resulting injury; and

(4) actual damages to the plaintiff's person or property.

104.    In general, Missouri courts hold that negligent supervision cases involve situations where a plaintiff and defendant have some relationship.

105.    Plaintiff and Castlewood clearly had a relationship. In fact, Castlewood had the highest duty of good faith to Plaintiff and was required to place Plaintiff's needs above its own.  In addition, Plaintiff and Castlewood had a contractual relationship in which Plaintiff paid good and valuable consideration for the alleged services rendered to Plaintiff.  Castlewood further made representations not just to Plaintiff but to the general public, that the services it allegedly provided constituted a "gold standard" and were superior to the services being offered by other treatment centers for the treatment of eating disorders.

106.    Castlewood knew that it was contracting with and providing alleged services to persons suffering from a mental illness with the second highest mortality rate amongst all mental illnesses. As such, it had the absolute duty to provide a safe, consistent treatment environment conducive to starting the recovery process from eating disorders and to properly supervise its employees to require them to hold to that standard at all times.

107.    Castlewood clearly had the absolute duty to not expose Plaintiff nor its patient population to a predator. Castlewood violated that duty by employing, as a therapist, a person suffering from anti-social personality disorder. Similarly, Castlewood's lack of supervision was so lax, that is if it wasn't' non-existent entirely, resulted in its CEO admitting that it is currently investigating other employees for abusive conduct.

108.    Because Castlewood does not adequately supervise its employees, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are within the jurisdictional limits of this Court for which Plaintiff herein sues.

109.    Castlewood's and Gibbs' conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justify an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Claims Against Castlewood and Riverside

## Count One

## Violation of the Business Premises Safety Act

110.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54 as if fully set forth herein.

111.    Castlewood and Riverside are jointly and severally liable for violations of RSMo. § 537.787, the Business Premises Safety Act.

112.   In January 2017, at the time Riverside acquired Castlewood, both Riverside and Castlewood knew, or had reason to know that harmful acts were being committed on the premises of the St. Louis operations and both had sufficient time to prevent on-going harmful acts.

113.   In a premises liability claims, when the plaintiff is an invitee, a possessor of land is subject to liability if it:

A.   Knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to invitees;

B.   Should expect that invitees will not discover or realize the danger or will fail to protect themselves against it, and;

C.   Fails to exercise reasonable care to protect them against the danger.

114.   Riverside and Castlewood, not only had actual knowledge of the dangerous condition on the property, that being allowing predators to have access to patients even after being informed of the bad faith conduct perpetrated by such employees but created the dangerous condition. Riverside and Castlewood's creation of the dangerous condition included, but is not limited to the following:

A.   not allocating sufficient financial resources to investigate, hire and train competent, professional mental health providers;

B.   hiring a person with anti-social personality disorder to act in the role of a trusted counselor;

C.   failing to investigate Gibbs before employing her in the role of a trusted counselor;

D.   failing to adequately train Gibbs;

E.   failing to properly supervise Gibbs;

     F.     failing to provide a safe environment where Plaintiff would be free from abuse and the actions of predators;

     G.     failing to protect Plaintiff from harmful predators like Gibbs.

115.    As a direct result of Castlewood and Riverside's conduct, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are within the jurisdictional limits of this Court for which Plaintiff herein sues.

116.    Castlewood's and Riverside's conduct clearly evidence an "evil motive" or "reckless indifference" or that Defendants' conduct was "outrageous." Defendants intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Defendants' conduct justifies an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Two

## Fraud By Non-Disclosure

117.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

118.    On January 3, 2017, Riverside acquired Castlewood from its former private equity owner, Trinity Hunt Partners. As previously noted, Castlewood at that time was, and remains, a deeply troubled institution. Further, at the time Riverside acquired Castlewood, its founder was being investigated by the State Committee of Psychologists of the State of Missouri. In conducting its due diligence, in all reasonable probability, Riverside would have discovered all of those issues.

119.    To attempt to separate itself from Castlewood's past issues, Riverside, as the owners of Castlewood made the decision to change Castlewood's name to Alsana. Riverside, on behalf of Castlewood Treatment Center, LLC filed and registered the fictitious name, Alsana with the Missouri Secretary of State on March 28, 2019.

120.    Like many investors in mental health, Riverside is focused on developing high-end residential facilities for self-pay and commercially insured patients rather than comprehensive outpatient services for both publicly and privately insured patients. This is because the reimbursement rate from private insurers for residential treatment care is financially must greater than partial treatment care or outpatient treatment care. In creating resort-like residential centers, Riverside panders to serving affluent patients who fly in from out of state, and don't necessarily offer medication-assisted treatment or a full continuum of follow-up outpatient services.

121.    Like many other private equity owners, Riverside discovered that it could make far greater profits by repeatedly treating patients who relapse, without being held accountable for outcomes. Riverside created and/or participated with Castlewood in creating an eating disorder treatment programming that is outside any reasonable or logical standard of care.

122.    When a private equity firm like Riverside controls a treatment center and financial success depends on rapid expansion, that treatment center's business and financial structure make it susceptible to practices that maximize revenue generation rather than prioritizing evidence-based practices and optimal treatment outcomes for its patients.

123.    Upon information and belief, Riverside determined that they must keep labor costs down by employing fewer people, people with little or no experience and medical

professionals with checkered backgrounds. In addition, many of the more specialized, higher paid, treatment professionals as employees but as 1099 contractors.

124.   Defendants' conduct, acts and omissions as set forth hereinabove constitute fraud by non-disclosure in that:

   (a)   Defendants deliberately failed to disclose material facts;

   (b)   Defendants had a duty to disclose those material facts;

   (c)   Plaintiff was ignorant of the facts and did not have an equal opportunity to discover them;

   (d)   Defendants intended Plaintiff to act or refrain from acting based on the non-disclosure; and

   (e)   Plaintiff relied on the non-disclosure which resulted in actual damages proximately caused by her justifiable reliance.

125.   Riverside, as the owner of Castlewood, and Castlewood, as the provider of medical and mental health treatment of eating disorders, had the legal, moral, ethical, social and fiduciary duty to Plaintiff to disclose all material facts pertaining to its operations.  As such, Defendants' acts, conduct, omissions and misrepresentations constitute fraud by non-disclosure which was the proximate and producing cause of Plaintiff's and Plaintiff Class' damages.

126.   Defendants' acts of fraud by non-disclosure resulted in actual and economic damages to Plaintiff for which amount Plaintiff seeks herein.  Moreover, Defendants engaged in such conduct knowingly, willfully, maliciously and intentionally.  Therefore, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## **Count Three**

## **Civil Conspiracy**

127.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 54, as if fully set forth herein.

128.    Riverside and Castlewood knowingly conspired to utilize the fictitious name "Alsana" as an instrument to attempt to distance themselves from Castlewood's past, pervasive wrong doings and to engage in acts designed to emphasize profiteering over providing competent medical and mental health treatment. The purpose of the conspiracy was to induce people suffering from eating disorders and their families to utilize the facilities owned and operating by Riverside and Castlewood.

129.    This scheme or artifice to defraud Plaintiff and others included deleting all reference to Alsana's true owner and identity, that being Castlewood Treatment Center LLC on the internet. As such, Riverside and Castlewood are falsely representing that Alsana has been in operations since at least 2002, falsely representing the efficacy of the treatment protocol utilized by Castlewood, representing that the properties owned and/or operated by Castlewood and Riverside were safe and free from predators and are making materially false, fictitious or fraudulent statements or representations in connection with the delivery of or payment for health care benefits.

130.    Upon information and belief, Riverside's and Castlewood's acts originated in the States of California, Missouri and Alabama and involve interstate commerce.  As such, Riverside and Castlewood knowingly entered into an agreement whereby they failed to disclose to Plaintiff and the general public, material information regarding the operations of Castlewood. Therefore, Riverside and Castlewood agreed to accomplish either an unlawful act or a lawful act by unlawful means and specifically intended to harm Plaintiff

and the patients who came to Castlewood.  Riverside and Castlewood had knowledge of the common object or purpose of the conspiracy and each of the entities committed one or more wrongful acts in furtherance of the conspiracy.

131.    Castlewood and Riverside intended to participate in the conspiracy and as a proximate result of such entities' conduct or acts, Plaintiff sustained damages in an amount in excess of the minimum jurisdictional limits of this Court for which amount Plaintiff herein sues.

132.    Moreover, Riverside and Castlewood engaged in such conduct knowingly, willfully, maliciously and intentionally.  Therefore, Plaintiff is entitled to recover her economic damages as well as punitive damages in an amount to be determined by the trier of fact.

<u>**REQUEST FOR TRIAL BY JURY**</u>

133.    Plaintiff hereby requests a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants appear and answer herein, and that upon final trial hereof, the Court and/or the trier of fact, grant the following relief:

1.    Assume jurisdiction over Plaintiff's claims;

2.    Declare that Castlewood and Gibbs committed acts of Spoliation of Evidence and enter an order stating that any such information should be construed against Castlewood and Gibbs;

3.    Hold that Castlewood and Gibbs, jointly and severally, are liable to Plaintiff under the causes of action and theories set forth hereinabove

4.    Hold that Castlewood and Riverside are jointly and severally, are liable to Plaintiff under the causes of action and theories set forth above;

5.      Hold that Plaintiff has sustained actual damages as a proximate result of Defendants' conduct;

6.      Award to Plaintiff her actual damages as a proximate result of Defendants' conduct;

7.      Award to Plaintiff's counsel all reasonable and necessary attorney's fees incurred prosecuting this action;

8.      Assess punitive damages against all Defendants in an amount to be determined by the trier of fact, and;

9.      Award such other relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

/s/Steven R. Dunn
Steven R. Dunn
State Bar No. 06252250
5830 Preston Fairways
Dallas, Texas 75252

Telephone (214) 769.7810
*steven@dunnlawfirm.net*

**ATTORNEYS FOR PLAINTIFF**